ORIGINAL

AO 91 (Rev. 11/82)                    **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>ASHLEY CHANTELL MACINTOSH | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>MJ 18-1725 |

Complaint for violation of Title 18, United States Code, Section 1704

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE ALICIA G. ROSENBERG | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>October 31, 2016 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1704]

On or about October 31, 2016, in Los Angeles County, within the Central District of California, defendant ASHLEY CHANTELL MACINTOSH knowingly possessed with intent to unlawfully and improperly use, and to cause the same to be unlawfully and improperly used, a key suited to locks adopted and in use at the time by the United States Post Office Department and Postal Service, and to any authorized receptacle for the deposit or delivery of mail matter, namely, a counterfeit postal arrow key.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>James Keenan |
|---|---|
| | OFFICIAL TITLE<br>U.S. Postal Inspector, U.S. Postal Inspection Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE<sup>(1)</sup><br>Alicia G. Rosenberg | DATE<br>July 2, 2018 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Frances S. Lewis x4850      REC: Detention

## **AFFIDAVIT**

I, James M. Keenan, being duly sworn, declare and state as follows:

### I.    **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint against and an arrest warrant for ASHLEY CHANTELL MACINTOSH ("MACINTOSH"), for possession of a counterfeit postal arrow key in violation of 18 U.S.C. § 1704.

2.    The facts set forth in this affidavit are from my personal observations, my training and experience, and information obtained from various law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrant.  It does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II.   **BACKGROUND FOR POSTAL INSPECTOR JAMES M. KEENAN**

3.    I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since June 2015.  I am currently assigned to the Los Angeles Division Mail Theft Team, which investigates crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail, fraud, and related activity in connection with access devices (including credit and debit cards), identity theft, and unauthorized use of other persons' information for financial

1

gain.  I completed a twelve-week basic training course in
Potomac, Maryland.  That course included training in the
investigation of identity theft via the United States Mail.
Prior to becoming a Postal Inspector, I worked as a Customs and
Border Protection Officer at the San Ysidro Port of Entry for
approximately three years.  I also completed a six-month basic
training course at the Federal Law Enforcement Training Center.
From my discussions with other Postal Inspectors I have learned
about mail theft investigations and common mail theft and
identity theft practices.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

4.   In October 2016, law enforcement stopped MACINTOSH
after finding her asleep in a parked Honda Civic with an open
container of alcohol in plain view.  MACINTOSH had a counterfeit
postal arrow key attached to her key ring for the car.  During a
consensual search of MACINTOSH's purse for her driver's license,
the officer saw multiple credit, debit, and gift cards in
various individuals' names.  MACINTOSH also had several
identification cards, including two California driver's
licenses, one in the name of S.G. and the other in her true
name, both of which bore MACINTOSH's picture.  In a <u>Mirandized</u>
interview, MACINTOSH said she bought the Honda Civic in S.G.'s
name, by paying $1,500 in cash and by using the identification
card in S.G.'s name bearing MACINTOSH's photo.

5.   In November 2016, pursuant to a federal search
warrant, Postal Inspectors searched MACINTOSH's apartment and
recovered many items related to mail and identity theft,

including counterfeit postal arrow keys, debit and credit cards, blank check stock, checkbooks, various identification documents, mail, bank statements, notebooks with account profiles, card readers, and a postal arrow lock.

6.   In January 2017, MACINTOSH was arrested for driving a stolen Audi with two passengers.  During a search of the Audi, law enforcement recovered additional items related to mail and identity theft, including approximately 174 pieces of mail, debit and credit cards, checks, money orders, bank account statements, passports, driver licenses and other forms of identifications not bearing MACINTOSH's name.  The car's owner, A.R., told law enforcement that a Bank of America debit card he had left in his car the evening it was stolen was later used without his authorization at the Koffea coffee shop in Koreatown.  A.R. provided video surveillance from the Koffea coffee shop, which appeared to depict a person resembling MACINTOSH and another un-identified male individual using A.R.'s card.  In a Mirandized interview, MACINTOSH admitted it was her in the surveillance still image from the coffee shop.

7.   In total, between the Honda Civic, MACINTOSH's apartment, and the Audi, law enforcement found, in addition to the counterfeit postal arrow keys, approximately 79 bank account numbers and names, 141 debit or credit card numbers and names, 30 credit cards, 63 debit cards, 1,034 checks, 65 driver licenses, 63 money orders, 28 identification cards, 7 passports, 11 social security cards, and 36 bank statements, none of which were in MACINTOSH's name.

3

## IV.  **STATEMENT OF PROBABLE CAUSE**

8.    From my own ongoing investigations of suspected mail thefts in the Barham Boulevard area in Los Angeles, California, my review of video surveillance from apartments in the area, my review of Los Angeles Police Department ("LAPD") reports and reports by other law enforcement officers, my conversations with other law enforcement officers including LAPD officers and other Postal Inspectors involved in the investigation of mail theft, and my own observations and my recollection of certain events, I am aware of the following:

### A.    **Suspected Mail Thefts in the Barham Boulevard Area**

9.    The Barham Boulevard area has experienced a significant increase in reported mail theft incidents over the past two months, and numerous unidentified individuals have been seen on video surveillance removing mail from apartments in the area and using counterfeit postal arrow keys[1] to access tenant mailboxes.  Postal Inspectors have been working for many weeks with property managers in the Barham Avenue area to facilitate

---

[1] USPS "arrow keys" are used by USPS mail carriers to unlock USPS "arrow locks" to gain access to housing complexes or apartment buildings and deliver mail to the respective mailboxes found therein.  In my training and experience, I have also learned that non-postal employees and mail thieves refer to arrow keys as "skeleton keys" or "shaved keys."  Mail thieves typically use stolen or counterfeit arrow keys to gain access to housing complexes or apartment buildings in order to steal mail from numerous mailboxes.  Mail thieves also steal USPS arrow locks to make counterfeit arrow keys through reverse engineering.  As a result of stealing mail, mail thieves can gain access to such items as checks, money orders, cash, and gift cards, as well as individuals' personal information, and use such information to commit bank fraud, check fraud, and access device fraud with credit cards and debit cards.

4

information sharing among these managers, Postal Inspectors, the LAPD Hollywood Division, and the Hollywood Post Office Station.

10.   To deter mail thieves from gaining access to their apartment buildings overnight, property managers in the Barham Boulevard area have adopted a practice of deactivating the intercom panels for their buildings, into which postal arrow keys (or counterfeit postal arrow keys) can be inserted to gain entry to the buildings, each night until 8 a.m. the next day. Although the mail thefts in the Barham Boulevard area have occurred on various days of the week, Postal Inspectors have noticed that these thefts regularly take place shortly after 8:00 a.m. when access via postal keys is frequently restored.

**B.   MACINTOSH Stopped in October 2016 with Counterfeit Postal Arrow Key in Fraudulently Purchased Honda Civic**

11.   On or about the morning of October 31, 2016, I was in the area of Barham Boulevard in Los Angeles, California to look for any unusual activity as the 8:00 a.m. hour was approaching.

12.   At approximately 7:45 a.m., I left my car and headed towards a Barham Boulevard property that Postal Inspectors have been investigating for recurring mail thefts.  As I walked towards that property, I noticed a gray-colored newer model Honda Civic (the "Honda Civic") parked in front of my car, bearing paper license plates from a car dealership.

13.   As I walked past the Honda Civic, I saw a person I initially believed to be a male slouched over behind the steering wheel.  Given the time and location where I saw the

paper-plated[2] Honda Civic, and given that I did not want to approach the car alone because I was not in uniform or clearly identifiable as a law enforcement officer, I reached out to LAPD to assist. I was also joined by Inspector Bazemore.

14. According to the LAPD incident report, at approximately 8:10 a.m., Officers Dominguez and Pena were dispatched in their marked patrol car. Upon arriving, Inspector Bazemore and I spoke with the officers about the increased mail theft in the area. Officer Dominguez approached the Honda Civic and saw a white female (who identified herself as S.G. but was later confirmed through a fingerprint check to be Ashley Chantell MACINTOSH) sleeping in the driver's seat. Officer Dominguez ran the Honda's vehicle identification number through the Department of Motor Vehicle database for any wants or warrants but received no hits.

15. Officer Dominguez then informed me that Officer Pena had seen an open container of Steel Reserve, which he recognized as a brand of beer, in a cup holder at the front of the car, which he believed provided a sufficient reason to commence a voluntary encounter with the driver asleep behind the wheel. Officer Dominguez knocked on the window and asked MACINTOSH to step out of the car. Officer Pena asked MACINTOSH for her proof of car insurance and registration, and MACINTOSH responded that they were located in the glove compartment. Officer Pena then

---

[2] Mail thieves will often remove state-issued license plates from the rental cars and replace them with paper plates from car dealerships, in order to avoid detection by law enforcement by making it harder to track down the cars.

asked MACINTOSH for consent to open the glove compartment to look for the documents and MACINTOSH replied, "yeah."

16.   Officer Pena opened the glove compartment and found a green bag containing multiple car fobs and shaved keys.   Officer Pena asked MACINTOSH how she obtained the fobs and shaved keys, and MACINTOSH responded, "I found them.   I like to collect them."   From his training and experience, Officer Pena knew that electronic fob keys are used to open and start "push-start" ignition cars, and shaved keys are used to open and start "key-start" ignition cars.

17.   After Officer Pena found the shaved car keys inside the glove box, Officer Dominguez retrieved MACINTOSH's car key and keyring from the ignition of the Honda Civic and saw what appeared to be a counterfeit postal arrow key on the keyring, which he showed to me.   I inspected the key and agreed that it appeared to be a counterfeit postal arrow key.

18.   When Officer Pena asked MACINTOSH for her identification, she said she did not have it on her person. When asked where her identification was, MACINTOSH responded that it was in her purse and gave Officer Pena permission to look in her purse, which he did.   While looking in the purse for MACINTOSH's driver's license, Officer Pena saw multiple credit, debit, and gift cards in various individuals' names, passport-sized photos, as well several identification cards, including two California driver's licenses, one in the name of S.G. and the other in name of Ashley Chantell Macintosh, both of which

bore MACINTOSH's picture, and a third California Driver's
license to E.D.

### C.   Field Interview with MACINTOSH

19.   Inspector Bazemore and I then introduced ourselves to
MACINTOSH and began an informal field interview while she was
standing outside the Honda Civic.  MACINTOSH was not under
arrest at the time, nor had she been placed in handcuffs.  I
told MACINTOSH that she was not under arrest but that she was
being detained at the moment pending a further investigation
into the items found inside her car.  MACINTOSH said she
understood and agreed to speak with me.

20.   I asked MACINTOSH her name, and she said it was S.G.
I then asked MACINTOSH who owned the Honda Civic.  She said it
was hers and that she bought it from a dealer in downtown Los
Angeles about one month before.  I checked the car's temporary
registration document and saw it was registered to S.G. at an
address on Manhattan Place in Los Angeles, California.  I asked
MACINTOSH where she lived, and she provided the same Manhattan
Place address.  She said that she worked as a graphic designer
but was currently unemployed.

21.   MACINTOSH provided me her cell phone number.  When I
asked her where her cell phone was, she said it was in the Honda
Civic, by the driver's seat.  I asked MACINTOSH for her consent
to enter her car to retrieve her cell phone, and she responded,
"yeah."  I then entered the car and recovered a cell phone from
the cup holder.  I asked MACINTOSH whether the device I had
retrieved was hers, and she responded that it was hers but was

8

not her main phone.  She then told me that there was another
cell phone by the driver's seat that I had not seen.  MACINTOSH
had me call her phone number, and I heard a device vibrating
underneath the driver's seat.

22.  After re-entering the car from the front passenger's
side and climbing over the passenger's seat to recover the
device from under the driver's seat, I saw what appeared to be a
handgun in the driver's side door panel.  I asked Officer
Dominguez to retrieve and safely secure the gun.  Upon further
inspection, he determined that it was actually an airsoft gun.

23.  Under the driver's seat of the Honda Civic, I found an
Apple iPhone, which I brought to MACINTOSH.  I asked her if she
would be willing to unlock the iPhone, but she said she did not
recall the password.  MACINTOSH confirmed that the cell phones
recovered from inside the car were hers.

24.  MACINTOSH said that she fell asleep in her car after
dropping off an ex-boyfriend, whom she identified only as
"Jose," at a property on Barham Boulevard.

25.  When asked about the counterfeit postal arrow key
found on her keyring, MACINTOSH said that someone who went by
the name "Detox," whose real name she believed was Joshua
Cortez, gave it to her approximately a week before and told her
that it was "a key to the city."  MACINTOSH also said that she
never used the key to steal mail and that she had tested it out
at her apartment complex, where it did not work.

26.  When asked about the identification cards found in her
purse, MACINTOSH said she had been "messing around" and making

9

identifications on her computer.  MACINTOSH also said the card
bearing the name "Ashley Chantell Macintosh" and her photo was
actually a friend's identification, which she had altered and
printed from her computer.  MACINTOSH repeated that the card
with her picture and the name "S.G." was her true identity.  She
then provided me with a cell phone number for "Ashley."

27.  MACINTOSH said she collects garage door openers,
identity cards, credit, debit, and gift cards as she comes
across them.  When asked about two passport photographs found in
her purse, MACINTOSH said one was of her and the other was of
her friend "Kat."  Furthermore, MACINTOSH admitted the passport
photos were going to be used to make identification cards.

28.  The LAPD officers then arrested MACINTOSH for
possession of burglary tools and booked her at Hollywood Jail.

29.  While booking MACINTOSH, LAPD Officers got a
fingerprint hit on an outstanding warrant in Orange County under
the name Ashley Chantal MACINTOSH.  MACINTOSH was booked on that
outstanding warrant as well, and later transferred to the LAPD
Metropolitan Detention Center for housing.

30.  In total, USPIS took custody of approximately 3 driver
licenses, one of which was in the name of Ashley Macintosh, two
passport photographs, one of MACINTOSH and one of S.G., 29
debit/credit cards in various names including MACINTOSH and some
of which had clearly been altered, and 12 gift cards.

31.  On or about October 31, 2016, I tested the counterfeit
arrow key from MACINTOSH's key ring and confirmed that it was
capable of opening a postal arrow lock.

D.   **Mirandized** Interview with MACINTOSH

32.  On the evening of November 1, 2016, at the LAPD
Metropolitan Detention Center in downtown Los Angeles, Postal
Inspector Susan Lurtgulprayad and I conducted a Mirandized
interview of MACINTOSH, which was recorded.

33.  I asked MACINTOSH to recount what she and I had
discussed the day before during my field interview with her.
MACINTOSH said that she had fallen asleep in her car and was
awakened by the police.  She admitted that there was an open
container of alcohol in her car and that she had been asleep
behind the steering wheel.  MACINTOSH further said she had
dropped off her friend "Jose" at his girlfriend "Jesse's" house
on Barham Boulevard at approximately 2:30 a.m.  She also claimed
that Jose had left behind the open container of alcohol that the
LAPD officers found in the car.  MACINTOSH then explained that
she drove around the area for a while, ended up parking in front
of a property on the 3000 block of Barham Boulevard around 3:30
a.m., and fell asleep in her car.

34.  MACINTOSH said that the LAPD officers found a postal
key on her keyring, which she had received from Joshua Cortez.
Cortez told MACINTOSH it was a "key to the city," and MACINTOSH
said she knew it was for opening mailboxes.  MACINTOSH recalled
trying the key on the mailbox at her apartment, but said that
"it didn't work."  She further explained that Cortez goes by the
nickname "Detox," provided his date of birth, and said she last
saw him approximately four weeks before.

11

35.   When asked about the shaved car keys and garage
remotes found in her car, MACINTOSH said she merely collected
these items.   She added that she often finds random things to
collect, such as old credit cards.   I asked MACINTOSH about the
PayPal gift cards found in her possession, and she responded
that they belonged to her.   She explained that she buys PayPal
gift cards at 7-Eleven and uses them to pay for her cell phones
and for other accounts that require payment by card.   When asked
about the various credit, debit, and gift cards found in her
purse that were not in her name, MACINTOSH said that she either
found them on the ground while walking or that people gave them
to her, and that these were more items she liked to collect.

36.   When asked about the Honda Civic in which she was
found sleeping, MACINTOSH said the car was hers and that she
bought it two months before at a Honda dealership in downtown
Los Angeles.

37.   When she was told that her fingerprint records
identified her as "Ashley Macintosh," and not "S.G." as she had
identified herself to LAPD officers and to me the day before,
MACINTOSH admitted her true name is "Ashley" and that she is 32
years old.   She further said that she knew the fingerprints were
going to come through, but that she was scared because she has a
nine-year-old daughter to provide for at home.

38.   MACINTOSH said she bought the car two months before,
in S.G.'s name, by paying $1,500 in cash and by using the
identification card in S.G.'s name bearing MACINTOSH's photo.
She explained that she pays $400 monthly for the car, but that

she believed the real S.G. would be held liable if MACINTOSH
were to stop making her car payments.  Although the car's
temporary registration paperwork was in the front window,
MACINTOSH said that she never received the license plates, which
were sent directly to S.G.'s home address because MACINTOSH had
used S.G.'s information to buy the car.  MACINTOSH added: "I
really didn't think it through.  I didn't think it was going to
actually work with the ID."

39.  I asked MACINTOSH to explain further how she was able
to purchase the Honda Civic under S.G.'s name.  She told me that
she found a piece of paper on the ground "like a college
transcript or something" bearing S.G.'s name and personal
information.  MACINTOSH said that she paid approximately $3 to
obtain S.G.'s Social Security number through a website called
"Spokeo."

40.  MACINTOSH said she used S.G.'s information because she
has bad credit and because a friend recommended that she do so.
She elaborated that she had the counterfeit driver's license in
S.G.'s name made in MacArthur Park, and that she and her
roommate, Katherinne Hernandez, got passport photos, which they
provided to the person who made the counterfeit licenses.
MACINTOSH added that the other passport photograph found in her
purse was a picture of Hernandez.

41.  I asked MACINTOSH what other accounts she opened under
S.G.'s name.  She told me she had opened a credit account at a
Macy's department store in downtown Los Angeles in S.G.'s name,
and that she had spent approximately $800 on the account but had

never received the actual credit card in the mail, which she believed had been sent to S.G.'s address.  MACINTOSH also admitted to applying for a few other online accounts in S.G.'s name, but said she did not think these applications actually went through.  Moreover, MACINTOSH admitted that she used the identification card with S.G.'s name to get a prepaid cell phone contract, which she insisted that she is paying for monthly.

42.  MACINTOSH said she lives at 531 S. Kenmore Avenue, Apartment #301, Los Angeles, California 90020 (the "MACINTOSH Home").

**E.    Search Warrant Executed on the MACINTOSH Home**

43.  On or about November 29, 2016, U.S. Magistrate Judge Steven Kim signed a search warrant for the MACINTOSH Home in Case Number 16-MJ-02343.

44.  On or about November 30, 2016, I and other Postal Inspectors executed the warrant and searched the MACINTOSH Home. MACINTOSH was present and temporarily detained for Inspector safety but shortly thereafter chose to leave the premises while Postal Inspectors conducted their search.  Postal Inspectors recovered many items related to mail and identity theft, including approximately 4 counterfeit postal arrow keys, 1 label printer, a credit card imprinter machine, a card reader/writer machine, 8 laptop computers, 7 cell phones, 1 ipad, 2 Dremel[3] tools, a postal arrow lock, blank check stock, as well as 31

--------------------

[3] From my training and experience I know Dremel tools are used to make counterfeit postal arrow keys.

14

debit and credit cards, 202 checks, 9 social security cards, 4
passports, 60 driver licenses, various identification documents,
mail, bank statements, notebooks with account profiles all in
other persons' names.  In total, Postal Inspectors identified
approximately 507 victims from the evidence recovered in the
MACINTOSH home.

      **F.    MACINTOSH Arrested in January 2017 in Stolen Audi**

      45.  According to an LAPD arrest report, on or about
January 14, 2017, at approximately 10:45 p.m., LAPD Officers
Diaz and Chin were assigned to the Olympic Division Gang
Enforcement Detail and driving in a marked black and white
hybrid police car.  While traveling southbound through the
north/south alley East of New Hampshire and South of Council, a
known tagging location for the 18th Street gang and numerous
tagging crews, Officers Diaz and Chin saw a black Audi RS6
bearing "Downtown LA" paper license plates parked with the right
passenger doors open directly next to fresh white tagging.
Officers requested all occupants to exit the car pending a
vandalism investigation.

      46.  A man later identified as Ruben Martinez ("Martinez")
exited the car from the rear right passenger area.  MACINTOSH
exited from the driver's area.  A man later identified as Miguel
Nava ("Nava") exited from the right rear passenger area.
Officer Diaz cleared the car for any additional occupants and
saw a spray can on the front right passenger seat at which point
all suspects were detained pending a further investigation.
Additional officers were requested, who arrived on scene to

15

assist.   Officers conducted a records check of the vehicle
identification number of the Audi and learned that the Audi had
been reported stolen.

47.   Officer Diaz then interviewed MACINTOSH after advising
her of her Miranda rights, which she agreed to waive.  MACINTOSH
said she was kicked out of her apartment recently and was
keeping her property inside the car.  MACINTOSH denied driving
the car to the location.  Officer Garcia arrived on scene to
assist and conducted a pat-down of MACINTOSH and recovered an
Audi car key from MACINTOSH's front right jacket pocket.

48.   After learning that the car was stolen, officers
searched the car.  During the search, the officers recovered,
among other things, six garage door remotes, two miscellaneous
cell phones, two checks, and one replica Sig Sauer BB gun.

49.   Officer Diaz also interviewed Martinez after advising
him of his Miranda rights, which he agreed to waive.  Martinez
said MACINTOSH was in the alley to meet with him to help him get
a hotel room.  Martinez said he had seen MACINTOSH in possession
of the car on previous incidents.  Martinez denied knowing the
car was stolen.

50.   Officer Oropeza arrived on scene and conducted a
Mirandized interview of Nava in Spanish.  Nava said he came
outside to meet with friends and denied having any knowledge the
car was stolen.

51.   The Audi key was verified to be fully functioning and
MACINTOSH was placed under arrest for a violation of Section
10851 of the California Vehicle Code for Driving without Consent

and she was transported to the LAPD Olympic Station for booking procedures.

52.   Martinez and Nava were transported to the Olympic Station pending further investigation.  Upon follow-up at the LAPD station, Martinez provided officers with a written statement regarding the incident.  Nava refused to provide officers with a written statement.  Martinez and Nava were then released from the station.

53.   At the Olympic Station, Officer Chin again Mirandized MACINTOSH and conducted a detailed interview using department video resources.  During the interview, MACINTOSH said she had prior knowledge of the car being stolen and had been driving the car for approximately a week and a half.  MACINTOSH provided officers with a written statement regarding the incident in which she admitted driving the stolen car and to writing her name on a few of the checks found in her purse which MACINTOSH said she didn't plan on cashing because she knew she would eventually get caught (with the information).  MACINTOSH further said she received about four credit cards from various people and thought about activating them to buy food, a hotel (room), clothes and other necessities.  MACINTOSH said she never activated or used the cards and that the banks could confirm this.  MACINTOSH said the car was found behind an abandoned building with the car keys left on the seat and a bunch of random items in the car for which MACINTOSH didn't know the owners of.  MACINTOSH admitted in her statement to storing some

17

of her belongings in the trunk when she was kicked out of her apartment.

54.   Officer Diaz reviewed the original stolen car report and discovered the car was originally stolen from a secure parking lot at the victim's residence.  MACINTOSH was re-arrested for Theft of an Automobile since Officer Diaz witnessed her in the car's driver seat, the car keys were on her person, MACINTOSH admitted driving the car, and MACINTOSH possessed multiple garage remotes possibly relating to where the car was originally taken.

55.   The car was then returned to the victim, A.R.

**G.    Postal Inspectors Review Evidence Recovered in Audi Car Driven by MACINTOSH**

56.   On January 18, 2017, at approximately 1:00 a.m. in the morning, I received a phone call from the LAPD Olympic Station regarding the arrest of MACINTOSH.  The officers informed me that A.R. found a large volume of mail/identity theft related materials that was left behind in his car MACINTOSH was driving on or about January 14, 2017, when he picked it up from the tow yard.  On or about January 17, 2017, A.R. arrived at the LAPD Olympic Station and returned the items to LAPD Officers, clarifying that they did not belong to him and that he did not want to be responsible for the stolen items.

57.   At approximately 1:45 a.m., I responded to the LAPD Olympic Station and took possession of the evidence found in MACINTOSH's car.  I was also provided with a copy of MACINTOSH's arrest report.

18

58.   I took the recovered evidence back to the USPIS Alameda Domicile where it was secured and later booked as additional evidence in my investigation into the activities of MACINTOSH.

59.   During a review of the evidence that was returned by A.R. on or about January 17, 2017, to LAPD Officers, which A.R. had recovered from inside the Audi MACINTOSH was driving on or about January 14, 2017, I identified over $38,264 in Money Orders and items belonging to over 512 different victims, including approximately 33 debit/credit cards, 832 checks, 174 pieces of mail, 2 social security cards, 62 money orders, 3 passports, 4 driver licenses, and bank account and credit card profiles not bearing the name of MACINTOSH.

**H.    Interview with Audi Owner A.R.**

60.   On or about January 22, 2017 I spoke with A.R. via the telephone and conducted a follow-up interview.  A.R. told me that his car was stolen on the evening of December 25, 2016, and that he filed a stolen vehicle report with the LAPD Olympic Station.  A.R. said he requested his apartment Manager provide him with video surveillance from the garage of his car which could assist in identifying the suspect(s) who stole it.

61.   On or about January 15, 2017, A.R. was contacted by LAPD Officers and notified his car had been recovered.  On or about January 17, 2017, A.R. went to the tow yard to retrieve his car.  A.R. went through the car upon arriving at home and discovered the car was full of trash and clothes not belonging to A.R.  In addition, A.R. said he found a red purse in the

19

front passenger seat area and a bunch of other credit cards,
mail and profiles which did not belong to him in the trunk of
the car.  A.R. said he ultimately returned these items back to
LAPD Officers at the Olympic station for further investigation.

### I.   MACINTOSH On Surveillance Video Using Victim A.R.'s Credit Card

62.  During our conversation, A.R. told me a Bank of
America debit card he had left in his car the evening it was
stolen was used on Christmas morning at the Koffea coffee shop
in Koreatown.  A.R. said he went to the coffee shop and was able
to take video with his cell phone of video surveillance of the
person using his debit card to make a purchase.

63.  That same afternoon following our conversation, A.R.
sent me an email and provided me with a text alert message from
Bank of America which alerted him to a declined transaction from
Vons on Christmas Day in the amount of $355.02.  Additionally,
the text message alerted A.R. to two approved transactions.  The
first was from Vons in the amount of $311.90.  The second was
from Koffea in the amount of $8.72.  A.R. also sent me the video
he took on his phone of video surveillance from the Koffea
coffee shop at or about the time of that purchase.  The Koffea
surveillance appeared to depict a person resembling MACINTOSH
and another unidentified male individual who was with her and
made a purchase.

### J.   Postal Inspectors Conduct Follow-Up Interview of MACINTOSH at Century Regional Detention Facility

64.  On January 27, 2017 at approximately 12:50 p.m.,
Postal Inspector Eula Toca and I conducted a <u>Mirandized</u>

interview of MACINTOSH where she was currently being held in custody for the theft of the Audi car.

65.   I showed MACINTOSH a photograph of a red handbag found in A.R.'s car following MACINTOSH's arrest.   MACINTOSH recognized the handbag and said it belonged to her.

66.   I asked MACINTOSH about surveillance video I had reviewed of her and an un-identified male individual in the Koffea Coffee Shop in Koreatown on or about December 25, 2016 using A.R.'s Bank of America debit card which he had left behind in his car and that MACINTOSH used to make a purchase. MACINTOSH admitted it was her in the surveillance still image I showed her from the coffee shop but would not identify the individual with whom she was with.

67.   I asked MACINTOSH about the VONS transactions which occurred on the same Bank of America debit card belonging to A.R.   MACINTOSH said she waited in the parking lot as her friend took the card and went into VONS.   MACINTOSH said her friend told her the card didn't work.   MACINTOSH would not say who her friend was that used the card but told us it was the same person who used the card at the Koffea Coffee Shop.   I told MACINTOSH one of the VONS transactions had processed in the amount of $311.90 and MACINTOSH said she didn't know anything about it.

68.   I showed MACINTOSH a picture of a U.S. Passport in the name of I.K. which was recovered in the car.   MACINTOSH said that she did not know I.K. and denied that he was the person on video with her in the Koffea Coffee Shop on Christmas Day.

69.   I asked MACINTOSH about the business bank accounts she had opened in the name of another victim, S.G.  MACINTOSH said she recalled doing so.  I asked MACINTOSH if she recalled transferring funds between the victim's original bank account and the subsequent business accounts she had created and she said she did.

70.   I asked MACINTOSH if she recalled depositing a check into one of those business accounts she had opened under S.G.'s account and MACINTOSH said "Oh! The one for Top Properties Corp?"  MACINTOSH recalled the check for being in the amount of $15,000.  I showed MACINTOSH a photocopy of the deposited check provided to me by Bank of America issued to Top Properties Corp and issued in the amount of $19,028.05, issued on September 01, 2016.  MACINTOSH confirmed it was the check we had been discussing.

71.   I showed MACINTOSH an ATM surveillance still image taken on September 23, 2016, from a Bank of America ATM located on Melrose and Fairfax in Los Angeles from the deposit of the Top Properties Corp check.  MACINTOSH identified herself in the still image but would not provide me with details on who was seen in the passenger seat of the car she was driving.

72.   I showed MACINTOSH a still image of her withdrawing some of the funds at a Bank of America ATM on or about September 25, 2016.  MACINTOSH said she did not withdraw all of the available funds because the bank had caught on and had closed the account before she was able to do so.

73.   I asked MACINTOSH if she was going to help us identify others involved with her mail/identity theft scheme.   MACINTOSH said that she would be willing to discuss it further at a future date but would want to have an attorney present at that time.

**K.   MACINTOSH Arrested for Using Victim S.G.'s Identity**

74.   On July 11, 2017 at approximately 6:35 p.m., LAPD Officers Guerrero, Cervantes, and Lazo were assigned to the Wilshire Gang Enforcement Detail.   The officers were in full uniform and driving a marked black and white hybrid police car, monitoring activities in the area.

75.   As the officers were driving northbound Harcourt Avenue towards Washington Boulevard they saw a silver Ford Mustang bearing California license plate 7WMM021 stopped on Harcourt Avenue south of Washington Boulevard and a gold Nissan bearing California license plate 4LKB903 stopped in front of the Ford Mustang.   The officers saw the front passenger (later identified as MACINTOSH) exit the silver Ford Mustang with a blue baseball bat in her left hand shouting at the occupants inside of the gold car parked in front of her.   LAPD Officers exited their patrol car and initiated a possible Assault with a Deadly Weapon investigation.

76.   As the officers exited the patrol car, MACINTOSH was seen walking towards the gold Nissan with a bat in her left hand yelling at a female seated in the passenger seat, later identified as C.R.   The driver of the Silver Ford Mustang, later identified as Bertha Farfan ("Farfan") was walking towards the rear of the Mustang but then immediately walked back and sat in

23

the driver's seat of the Mustang.  Farfan was identified as a known wanted felony suspect who was on probation for Grand Theft Auto.  Farfan and MACINTOSH were detained without incident.

77.  MACINTOSH told Officer Guerrero her name was S.G. and provided her date of birth as September 9, 1993.  Officer Guerrero asked MACINTOSH why she had a bat in her hand and MACINTOSH said she was "messing around" because she knows the occupants of the gold Nissan.  Officer Cervantes spoke with the driver of the gold Nissan, identified as T.S., and C.R., the passenger.  C.R. said she knew Farfan and MACINTOSH and that they were all just joking around.  Officer Cervantes conducted a want/warrant check of all cars and persons at scene using department resources.  Officer Cervantes discovered the Silver Ford Mustang was a reported stolen car and confirmed Farfan's outstanding felony warrant.  The information MACINTOSH provided to Officer Guerrero returned to a California driver license F3059905 in the name of S.G.

78.  Officer Guerrero spoke with MACINTOSH after MACINTOSH waived her Miranda rights and agreed to speak to him.  MACINTOSH said the Mustang belonged to her friend "Greg."  Greg rented the car and let her borrow it to pick up Farfan from the LAX Airport.  MACINTOSH said when Farfan met with her, she let Farfan drive the Mustang.  According to MACINTOSH, she and Farfan took side streets to get home because of traffic and ended up on Harcourt Avenue and Washington Boulevard.  MACINTOSH said she was unaware the car was stolen.

79.  Officers released T.S. and C.R. at the scene after determining no crime was committed.  MACINTOSH and Farfan were transported by Sergeant Morgan to the LAPD Wilshire Station pending an arrest for the stolen car and further investigation.

80.  Officer Guerrero contacted the victim of the stolen car, A.G., who said she worked for Skurt, a car rental company.  A.G. confirmed she reported the car stolen on July 11, 2017 and did not know who rented the car.  Galvan said she received information from Postal Inspector Keenan (me) that the car was rented with fraudulent credit cards and immediately filed a stolen car report with LAPD Southwest Division.  Galvan provided Officer Guerrero with my contact information and said she had no further information.

81.  According to his report, Officer Guerrero contacted me and I advised the car was rented with fraudulent credit cards.  Officer Guerrero told me he detained two individuals in the car, Farfan and S.G.  I advised Officer Guerrero that S.G. is the name of an identity theft victim and an alias that MACINTOSH uses.  I further advised MACINTOSH is under federal investigation for a fraud case involving a victim by the name of S.G.

82.  Following our conversation, Officer Guerrero used other department resources in order to positively identify MACINTOSH.  The name S.G., which MACINTOSH had initially provided to Officer Guerrero in the field was discovered to be an alias for MACINTOSH.  Officer Guerrero realized MACINTOSH was attempting to conceal her real identity.

83.   Officer Cervantes re-admonished MACINTOSH of her
Miranda rights and MACINTOSH agreed to be interviewed.
MACINTOSH told Officer Cervantes her name was "S.G."  Officer
Cervantes asked MACINTOSH what her name is on her birth
certificate and MACINTOSH responded "S.G."  Officer Cervantes
asked if her name was Ashley, and MACINTOSH responded "No," and
that Macintosh was a fake name she had used in the past to
conceal her identity.  Officer Cervantes advised MACINTOSH that
she was falsely impersonating another person and was going to be
arrested.  MACINTOSH said she was scared to reveal her true
identity because she is on formal probation for receiving stolen
property and may have had an outstanding felony warrant.

84.   From MACINTOSH's statements, it appeared to Officer
Guerrero that MACINTOSH was intentionally concealing her
identity by impersonating S.G. who is a victim of fraud in an
ongoing federal investigation.  The effort to deceive LAPD
Officers went on for approximately four hours and delayed their
investigation.  MACITNOSH was subsequently arrested for False
Impersonation of a Person, in violation of California Penal Code
Section 529.

85.   Officer Guerrero determined Farfan to be in possession
of the stolen vehicle and arrested her for a violation of the
California Vehicle Code Section 10851(a), Driving without
Consent.

**L.    Summary of Evidence Recovered**

86.   In reviewing all of the evidence currently in the
possession of the United States Postal Inspection Service from

the Honda Civic, the MACINTOSH Home, and the Audi, I am aware that we have identified approximately 79 bank account numbers, 141 debit or credit card numbers, 30 physical credit cards, 63 physical debit cards, 1,034 checks, 65 driver licenses, 63 money orders, 28 identification cards, 7 passports, 11 social security cards, and 36 bank statements, none of which were in MACINTOSH's name.

## V.    CONCLUSION

87.    For all the reasons described above, there is probable cause to believe that ASHLEY CHANTELL MACINTOSH has

//

//

committed a violation of 18 U.S.C. § 1704 (Possession of a

Counterfeit Postal Arrow Key).


                                    James Keenan
                                    Postal Inspector
                                    U.S. Postal Inspection Service


    Subscribed to and sworn before
    me this 2nd day of ~~June~~ July 2018.

    HONORABLE ALICIA G. ROSENBERG
    UNITED STATES MAGISTRATE JUDGE